445 P.2d 467

**The STATE of Arizona, Appellee,**

v.

**Kenneth L. STURGEON, Appellant.**

**No. 2 CA–CR 112.**

Court of Appeals of Arizona.

Oct. 4, 1968.

Gary K. Nelson, Atty. Gen., William E. Eubank, Asst. Atty. Gen., Phoenix, for appellee.

Benjamin Lazarow and William R. Stevens, Jr., Tucson, for appellant.

HATHAWAY, Chief Judge.

Kenneth L. Sturgeon has appealed from his conviction for presenting a false claim with intent to defraud in violation of A.R.S. § 13-317.[1] The cause was tried to a jury.

On May 5, 1966, Sturgeon, a captain in the Pima County Sheriff's department, obtained permission from the sheriff to attend a seminar on Mountain Search and Rescue, being conducted at Idyllwild, California. Sturgeon was in charge of the Pima County Search and Rescue organization, a group functioning independently but in liaison with the sheriff's office. The sheriff gave Sturgeon an authorization for advance travel pay, which he took to the County Treasurer's office and used to procure a draft in the sum of $200, which he cashed.[2]

Sturgeon contacted several local pilots, connected with the search and rescue group, to see if any of them would be interested in going along with him at Sturgeon's expense. He was unsuccessful in finding anyone who wanted to go. The next day, Friday, May 6, 1966, he decided to make the drive alone and obtained permission to use a sheriff's patrol car. As he was leaving Tucson, he decided to ask one Dewey Foster, a service station mechanic and member of the search and rescue group, if he wanted to make the trip. Sturgeon stopped at the station where Foster worked and Foster agreed to go along, understanding that Sturgeon would pay all expenses for both parties.

After leaving Tucson, Sturgeon suggested that they detour to Las Vegas, rather than follow the direct route through Kingman. Foster agreed. They arrived in Las Vegas that evening. Foster slept in the patrol car most of the night while Sturgeon gambled. Early the next morning they left and drove on to Idyllwild, arriving sometime during that day, Saturday, May 7. They attended meetings at the seminar on Saturday evening and Sunday and returned home Sunday evening.

During the trip, Sturgeon and Foster both spent exclusively from the $200 cash, which Sturgeon had received, for payment of their expenses. When they returned to Tucson, $80.73 was left, showing that they had spent a total of $119.27. Sturgeon testified that he intended to repay the full $200 to the county, because he had made a "semi-vacation" out of the trip by going out of the way to Las Vegas.

Shortly after his return to Tucson, Sturgeon took the remaining $80.73 to the treasurer's office and turned it in to Miss Hamilton, an accounting clerk. Sturgeon maintains that he intended to pay that amount back *on account* and to repay the remaining $119.27 when he got the money, in one or two paydays. Miss Hamilton would not accept the money, however, without a claims voucher.[3] Miss Hamilton

1. A.R.S. § 13-317 provides:
   "A person who, with intent to defraud, presents a false or fraudulent claim, bill, account, voucher or writing for allowance or payment to a public board or officer authorized to pay them when genuine, is guilty of a felony."
2. A.R.S. §§ 38-621 through 38-624 authorize travel pay for "every public officer, deputy or employee of the state, or of any department, institution or agency thereof" when traveling away from his place of duty on official business. A maximum of $15 per day is allowed for subsistence.
3. The $200 advance had to be followed up within 60 days with an actual accounting for expenditures under the accounting procedures employed by the treasurer's office. If this was not done, a demand for the entire advance would, under those procedures, be sent to the party who had received the advance.

testified that she did not remember Sturgeon offering to pay the $80.73 on account, though she admitted that was "possible."

Since Sturgeon could not return the funds remaining in his hands on account, under the procedures authorized in the treasurer's office, he could only (1) submit a claims voucher, (2) refund the entire $200, or (3) keep the $80.73 until he obtained the $119.27 deficiency. Sturgeon testified that he decided to file a claim for expenses to cover the $119.27 until he could afford to pay that amount back. He therefore prepared and submitted a voucher listing the following expenses:

| Motel | 2 rooms, 3 nights each $8.32 times 6 | $49.92 |
|---|---|---|
| Seminar Registration | $5 each for two | $10.00 |
| Food | $6.68 per day, 2 men, 3 days | $40.08 |
| Gasoline | | $19.27 |
| | Total | $119.27 |

Miss Hamilton apparently was not aware that Foster was not a county employee and therefore was not entitled to be reimbursed on his part of the expenses. She refused, however, to allow Sturgeon's claim for Foster's expenses on Sturgeon's voucher. She crossed off the items listed for Foster ($24.96 for motel, $20.04 for food and $5 for registration—Total $50) from Sturgeon's voucher and gave him another for Foster to sign in order to account for the additional $50.

Sturgeon called Foster and asked him to come over and sign the voucher prepared for him, but Foster said that he could not. Sturgeon then, apparently with Foster's permission, asked Mrs. Sturgeon to sign Foster's name to the second voucher. The second voucher was submitted to the treasurer's office, according to Sturgeon, with only Foster's signature on it. On July 7, approximately two months after receiving the $200 advance, Sturgeon went to the treasurer's office and tendered the remaining $119.27 to Miss Hamilton, which she accepted and for which she gave a receipt.

Sometime prior to July 7, complaint was made to the Pima County Board of Supervisors by someone who had noticed the patrol car parked on a Las Vegas street while Sturgeon was in the casino. During June, also before Sturgeon had repaid the $119.27, one of the members of the Board of Supervisors asked Sturgeon who had authorized the trip. An investigation was made concerning the trip and it was discovered, apparently sometime *after* July 7, that Sturgeon's figures on the vouchers were false. The true figure for the $49.92 reported for motel bills was determined to be $8.32. Sturgeon and Foster slept in a motel only one night, rather than the three reported, and they slept in the same room, rather than separate rooms as reported. The registrar at the seminar testified that Sturgeon did not pay registration fees for either himself or Foster as claimed and that the registrar's signature on the registration card attached to the voucher was false.

Sturgeon contends that the trial court erred:

"1. * * * in not granting a directed verdict when the evidence showed that the accused intended to repay the county as of the time the false vouchers were submitted.

"2. * * * in not granting a directed verdict when the only evidence of an 'intent to defraud' was circumstantial evidence and the defendant presented a reasonable hypothesis of his innocence.

"3. * * * in not granting a motion for new trial when the State had not presented substantial or competent evidence showing an intent to defraud the State of Arizona."

The three questions in effect query, does the evidence support the conviction? We conclude that it does.

Sturgeon's counsel first contends that there was no intent to defraud the county, since Sturgeon intended all along only to *use* the county's money and to later repay the full amount. He contends that this is borne out by Sturgeon's conversations with some 20 people that he would handle all of the expenses if they would ride with him. Foster testified that Sturgeon told him before they left that "the trip was on him." He further points out that Sturgeon did pay all the bills. Miss Hamilton's acceptance is asserted to be evidence that Sturgeon did tell her, when he attempted to repay the $80.73 when submitting the original voucher, that he intended to repay the entire amount. Any possible inference of intent to defraud, he asserts, is further negated by his repayment of the remaining $119.27 on July 7—a time when no demand had been made upon him for the money and no one had questioned the correctness of the expenses. Further, the defendant contends, the vouchers were clearly intended simply to cover the "loan" from the county, since the amount was computed by taking the maximum daily allowance for subsistence of $15 per day under A.R.S. § 38–624, subsec. B for out-of-state travel, multiplied times six (two men for three days), plus ten dollars registration fees, plus $19.27 for gasoline. He also contends that the conviction was based upon passion, rather than evidence, because the trial was held during a period when Adam Clayton Powell, Senator Thomas Dodd, and other public officials were broadly criticized for improper conduct in public office.

This contention is overthrown by the evidence. The jury may have disbelieved his testimony that he intended all along to repay the county. His statements to others that the "trip is on me" did not conclusively establish that he intended to meet the expenses from his personal funds. Rather, the intended message seemed to be, "it will not cost you anything." Only the county's money was used. The $50 or $60 of his own money which he had when he left remained intact on his return, despite his gambling most of the night in Las Vegas.

Although no demand had been made upon Sturgeon on July 7, when the repayment of the balance of the funds was made, the evidence is sufficient to show that he might have felt "under the gun," since a member of the County Board of Supervisors had questioned him about the trip. Though he had been questioned only concerning who had authorized the travel, nevertheless, the propriety of the trip was in question sometime during the first week of June, prior to the repayment. Sheriff Waldon V. Burr testified that he also had talked to Sturgeon about the trip, and though he could not remember the date he stated that it could have been prior to the time of repayment. The sheriff testified that he had talked to Sturgeon, prior to July 7, concerning the complaint which had been made to the Board of Supervisors. This evidence is sufficient to support an inference that Sturgeon repaid the county in an effort to "clean up" the matter.

In the face of the evidence, the trial court properly submitted the question of intent to the jury. In Harris v. State, 41 Ariz. 311, 315, 17 P.2d 1098, 1100 (1933), our Supreme Court stated:

"Whether the defendant, in fabricating and presenting the false claim to the state auditor for allowance, intended to defraud the state, was a question of fact peculiarly within the province of the jury to decide * * *."

In *Harris,* a former State Adjutant-General had admitted filing a false claim but attempted to justify it by saying that the State owed him over three times the amount. The problem in *Harris* is analogous to the one before us in that both

involved admittedly false claims against the State—both with claimed justification. An affirmative answer to the question, whether Sturgeon had *mens rea* at the time he filed the vouchers, is supported by the evidence.

The jury chose to believe the evidence pointing to guilt. Their verdict is supported by substantial evidence and we must affirm. State v. Rivera, 94 Ariz. 45, 381 P.2d 584 (1963); State v. Bearden, 99 Ariz. 1, 405 P.2d 885 (1965); State v. Jackson, 101 Ariz. 399, 420 P.2d 270 (1966).

Affirmed.

KRUCKER, J., and WILLIAM C. FREY, Superior Court Judge, concur.

NOTE: Judge JOHN F. MOLLOY having requested that he be relieved from consideration of this matter, Judge WILLIAM C. FREY was called to sit in his stead and participate in the determination of this decision.